# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:11-CV-653-DCK

| | |
|---|---|
| CHRISTINA J. BARNETTE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   **ORDER** |
| | ) |
| CITY OF CHARLOTTE, | ) |
| | ) |
| Defendant. | ) |

**THIS MATTER IS BEFORE THE COURT** on Defendant's "Motion For Summary Judgment" (Document No. 49); Plaintiff's "Amended Motion To Strike Affidavit of Kathy Sanders" (Document No. 53), "Amended Motion To Strike Affidavit of Victoria O. Johnson" (Document No. 54), "Amended Motion To Strike Affidavit of Ronald Howard" (Document No. 55); and Plaintiff's "Motion For Leave To File A Sur-Reply" (Document No. 64). The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and these motions are now ripe for disposition. Having carefully considered the motions, the record, and applicable authority, the undersigned will deny the motions.

## I. PROCEDURAL BACKGROUND

Christina J. Barnette ("Plaintiff") filed her original "Complaint" (Document No. 1, pp.5-8) in this action in the Superior Court of Mecklenburg County, North Carolina, on December 1, 2011. On December 23, 2011, the City Of Charlotte ("Defendant") filed its "Notice Of Removal" (Document No. 1) to this Court. Following the parties' "Joint Stipulation of Consent To Exercise of Jurisdiction by a United States Magistrate Judge" (Document No. 4), the

1

undersigned issued a "Pretrial Order And Case Management Plan" (Document No. 5) on January 9, 2012.

On April 2, 2012, Plaintiff's "Amended Complaint" (Document No. 13) was filed. Plaintiff's "Second Amended Complaint" (Document No. 27) was filed July 9, 2012. Finally, Plaintiff's "Third Amended Complaint" (Document No. 47) was filed on September 5, 2012. Plaintiff's Complaint asserts claims for failure to hire based on gender discrimination and/or retaliation. (Document No. 47).

Defendant's "Motion For Summary Judgment" (Document No. 49) and "Memorandum In Support…" (Document No. 49-1) were filed on November 1, 2012. The "Amended Motions To Strike…" (Document Nos. 53-55) certain affidavits were filed November 16, 2012. On November 19, 2012, "Plaintiff's Responses To Defendant's Motion For Summary Judgment And Memorandum Of Law" (Document No. 57) was filed. "Defendant's Reply In Support Of Motion For Summary Judgment" (Document No. 60) was filed December 3, 2012. Plaintiff has also filed a "Motion For Leave To File A Sur-Reply" (Document No. 64).

As of December 18, 2012, all of the pending motions were ripe for review and disposition.

## II. STANDARD OF REVIEW

The standard of review here is familiar. Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Only disputes between the parties over material facts (determined by reference to the substantive law) that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id.

Once the movant's initial burden is met, the burden shifts to the nonmoving party. Webb v. K.R. Drenth Trucking, Inc., 780 F.Supp.2d 409 (W.D.N.C. 2011). The nonmoving party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248. In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the non-moving party, that is, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. At summary judgment, it is inappropriate for a court to weigh evidence or make credibility determinations. Id.

### III. DISCUSSION

**A.     Defendant's "Motion For Summary Judgment"**

Defendant asserts that it is entitled to summary judgment on all counts because, *inter alia*, Plaintiff has failed to make a prima facie case to justify the relief she seeks; all the evidence, viewed in the light most favorable to Plaintiff, fails to create a genuine issue as to any material fact; and Defendant has articulated legitimate business reasons for not hiring Plaintiff. (Document No. 49, p.1). The undersigned is not persuaded by Defendant's arguments and instead finds that the evidence suggests that there are multiple genuine issues as to material facts

in this case. Notably, several of the disputed facts directly involve Defendant's support for its contention that it had legitimate business reasons for not hiring Plaintiff.

### 1. Factual Background

Plaintiff was hired by Metro Staffing, Inc. ("Metro"), a temporary staffing agency, in June 2009. (Document No. 47; Document No. 49-1, pp.1, 5-6). Plaintiff was then assigned to Defendant City of Charlotte's Solid Waste Services, Collections Division ("SWS"), as a Sanitation Equipment Operator ("SEO") on or about June 17, 2009. (Document No. 57, p.1; Document No. 49-1, p.6). Plaintiff was never directly employed or paid by Defendant. (Document No. 49-1, p. 6) (citing Document No. 47). Plaintiff "was usually assigned to drive a Solid Waste "rear loader" truck for collecting yard waste and other refuse, but sometimes she was assigned to drive a recycle truck or otherwise work in the field." (Document No. 49-1, p. 6).

According to Defendant, SWS acquired several vehicles in the fall of 2009 that carried a new device, a Diesel Particulate Filter ("DPF") system, designed to reduce pollutants. Id. The DPFs need to be cleaned or "regenerated" periodically, usually once or twice a day, depending on vehicle use. Id. The process is commonly referred to as a "regen." Id. If the "regen" was not properly performed, the truck would shut down and cease to operate. Id. Defendant contends that the truck manufacturer sent representatives to train Defendant's employees on the "regen" process, and that Defendant's Fleet Manager, Kathy Sanders ("Sanders") also conducted such training. Id. In or about early October 2009, the truck manufacturer threatened to charge $4500 to make a site visit to fix a "regen" breakdown of one of its trucks. (Document No. 49-1, pp.6-7).

4

Defendant's Statement Of Facts includes the following synopsis of events, which serves as the crux of its argument that it had legitimate business reasons for declining to hire Christina Barnette.

> Ms. Sanders noticed that Plaintiff Barnette was experiencing far more "regen" problems with the vehicles she was assigned to drive than the other drivers. These problems often caused the vehicles to break down in the middle of their routes, causing operational and productivity problems and expense for Defendant. Consequently, Ms. Sanders made arrangements to meet with Plaintiff Barnette one-on-one. Ms. Sanders carefully explained the "regen" process to Plaintiff Barnette. But later, Ms. Sanders noticed that Plaintiff Barnette continued to experience the same "regen" issues after that first meeting. So, Ms. Sanders met with Plaintiff Barnette one-on-one a second time to again explain the "regen" process to Plaintiff Barnette to avoid future breakdowns. See, Affidavit of Kathy G. Sanders, Exhibit 2, hereto.
>
> In addition to those operational issues, Plaintiff Barnette was also causing problems by her behavior on the job. Early in Plaintiff Barnette's tenure with Defendant, **in late August or early September 2009**, she got into an ongoing altercation with her then supervisor, Team Leader Charles Mathis ("Mr. Mathis"). Tensions increased to a point that they requested a meeting with Ronald Howard, Assistant Director of Defendant's Solid Waste Services ("Mr. Howard"), but Mr. Howard was out of the office and not available. So, Victoria O. Johnson, Director of Defendant's Solid Waste Services ("Ms. Johnson"), met with them instead. Mr. Mathis complained that Plaintiff Barnette was constantly refusing to follow procedures, and not cooperating with her supervisor's directives. Ms. Johnson counseled and warned Plaintiff Barnette in "clear and distinct terms" that she needed to cooperate and follow procedures, or her services would no longer be required by Defendant City of Charlotte. See, Affidavit of Victoria O. Johnson, Exhibit 1, hereto.

(Document No. 49-1, p.7) (emphasis added).[1]

---

[1] In its reply brief Defendant states that Plaintiff's dispute with Mathis was "either in September 2009 or January 2010." (Document No. 60, p.2).

Defendant reports that on either August 31 or September 15, 2009, Plaintiff submitted her first application for full time employment with Defendant. (Document No. 49-1, p.8). According to Defendant, she was interviewed by a panel, and then selected by the panel, along with others, to be forwarded to the ultimate decision maker, Ronald Howard, Assistant Director of SWS ("Howard"). Id. A background check was performed on Plaintiff. Id. At about that time, Sanders purportedly told Howard that Plaintiff "was continuing to experience the disruptive and expensive "regen" breakdown issues," and that repeated counseling by Sanders on proper vehicle operation was "to no apparent avail." Id.

Based on Plaintiff's purported "regen" issues, Howard determined that Defendant should "hold off on hiring Plaintiff Barnette." Id.; see also, (Document No. 49-4, pp.2-3) and (Document No. 60, pp.2, 6-7) ("As a result of Ms. Sanders' reports, Mr. Howard gave instructions to put Plaintiff's application for employment on hold. . . . Defendant's legitimate business reason [for not hiring Plaintiff] has always been Plaintiff's ongoing problems with "regen" breakdowns of the trucks she was operating.").

Plaintiff disputes several of the most pertinent facts above. Specifically, she contends that: "at no time" was she interviewed for a position by Defendant; she had no training in 2009 on "regen" by Sanders or anyone else; that she didn't even have any discussions with Sanders about "regen" issues in 2009, and never met with Sanders one-on-one in either 2009 or 2010; and that she "never had regen issues other than the daily regen light coming on that all drivers of those trucks experienced and the October 7 breakdown." (Document No. 57, pp.5-6; Document No. 57-1, p.4). Plaintiff also asserts that Defendant's version of the facts is inaccurate because

Mark Adams, and not Charles Mathis, was her supervisor in the fall of 2009. (Document No. 57, p.6).

In December 2009, Plaintiff complained to management that she was being sexually harassed by a co-worker.[2] (Document No. 49-1, p.8; Document No. 47, p.1; Document No. 57, p.2). There appears to be no dispute that Defendant soon thereafter, on or about December 12, 2009, terminated the offending co-worker and that there were no further incidents of harassment involving Plaintiff.

On or about January 27, 2010 and February 4, 2010, Plaintiff submitted her second and third applications for employment with Defendant. (Document No. 49-1, p.8; Document No. 57, p2). Plaintiff was never selected from these pools to be forwarded to Howard for further consideration. Id.

Defendant contends that Plaintiff "continued to have issues with discipline and her performance on the job." (Document No. 49-1, p.9). As a result, in or about February or March 2010, Cassandra Cantey ("Cantey") from Metro purportedly suggested that Defendant release Plaintiff. Id. In sharp contrast to Defendant's version of events, Plaintiff contends that Cantey has denied under oath that she ever made any such suggestion, or that she was ever aware of any alleged performance or vehicle operation problems by Plaintiff. (Document No. 57, p.7). Plaintiff further asserts that Cantey gave her "a 100% performance rating," and that her SWS supervisors gave her satisfactory or better than satisfactory performance reviews, that her SWS

---

[2] Plaintiff asserts in her Complaint that she reported the harassment to Noble Scott (Operations Supervisor) and Ron Howard, however, her response to the pending motion states that she reported to Keith Higgins (SWS Operations Supervisor) and Howard.

7

supervisor recommended her for hire, and that she was repeatedly told by Defendant supervisors that "they could not figure out why she was not being hired." (Document No. 57, pp.3, 7).

On June 17, 2010, Plaintiff filed a charge of discrimination based on retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC"), charge number 430-2010-02269, alleging that she had not been hired based on her complaint of sexual harassment. (Document No. 47, p.2; Document No. 57, p.3).

On August 3, 2010, Metro employees, including Plaintiff, were released by Defendant. (Document No. 49-1, p.9). Defendant essentially contends that Howard had determined it wasn't worth the trouble to release Plaintiff in or about February or March 2010, as Cantey had purportedly suggested, and instead kept her on until August 3, 2010. (Document No. 49-1, p.9). According to Plaintiff, "[i]n the days immediately preceding and immediately following August 3, 2010, a number of temporary employees who had served less time with the City than had Plaintiff were hired by the City in SEO positions." (Document No. 47, p.2).

On or about August 5, 2010, soon after being released by Defendant, Plaintiff amended her EEOC charge number 430-2010-02269 to add a claim for discrimination based on sex. (Document No. 47, pp. 2-3; Document No. 57, pp.3-4). Also on or about August 5, 2010, Plaintiff filed a second charge of discrimination with the EEOC based on retaliation relating to her termination of employment. Id. Plaintiff's second charge was assigned number 430-2012-131 and sent to Defendant in October 2011. Id.

Plaintiff received a Right To Sue letter regarding her first EEOC charge on or about September 2, 2011. Plaintiff's original Complaint in this action was filed in the Superior Court of Mecklenburg County, North Carolina on December 1, 2011.

**2. Movant's Burden**

As noted above, the movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant's initial burden is met, the burden shifts to the nonmoving party. Here, Defendant has failed to demonstrate an absence of a genuine issue of material fact in support of its motion for summary judgment.

As set forth in the preceding Factual Background, Defendant rests its non-discriminatory "legitimate business reason" for declining to hire Plaintiff on her alleged ongoing problems with "regen" breakdowns. However, Plaintiff denies such problems, and further denies she ever had training or meetings with Sanders to address "regen" problems. In reply, Defendant has not offered any corroboration for Sanders' version of the facts related to "regen" problems and purported meetings. Rather, Defendant seems to state in its reply only that what Sanders told Howard was consistent with what Sanders stated in her affidavit about Plaintiff. (Document No. 60, p.6). Viewing the facts most favorable to Plaintiff, the information Sanders conveyed to Howard that then formed the basis for his decision not to hire was inaccurate and misleading.

In addition, Defendant asserts that Plaintiff had behavior problems that support its decision not to hire her. (Document No. 49-1, p.7). Specifically, Defendant states that in late August or early September 2009, Plaintiff "got into an ongoing altercation with her then supervisor" Charles Mathis. Contrary to Defendant's version of events, Plaintiff denies that Mathis was her supervisor prior to mid-December 2009. Moreover, Plaintiff seems to contend that the alleged altercation with Mathis happened on or about January 12, 2010, and that Defendant's previous statements support that date. (Document No. 57, p.5).

Besides the disputed facts that Defendant purportedly relied on to reach its decision, other important facts are also disputed. For example, Defendant asserts that Cantey at Metro Staffing encouraged Howard to fire Plaintiff, while Plaintiff asserts that Cantey denied any such suggestion under oath, and actually gave Plaintiff "a 100% performance rating." (Document No. 57, pp.5-6). The parties also dispute whether or not Plaintiff was ever interviewed for a job. (Document No. 57, p.3).

The undersigned notes that even after discovery has been completed, there is quite a gulf between the parties on when, or if, certain key events underlying this case happened. Plaintiff's version of the facts strongly suggests that it would have been impossible for Defendant to decide not to hire Plaintiff for the reasons stated during the fall of 2009.

Defendant's memorandum in support of its motion acknowledges that as the moving party it "has the initial burden to show a lack of evidence to support Plaintiff's case" and that "**[i]f this is showing is made**, the burden then shifts to Plaintiff who must convince the Court that a triable issue does exist." (Document No. 49-1, p.4) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)) (emphasis added). Rather than showing a lack of evidence to support Plaintiff's case, Defendant's motion and the subsequent briefing has highlighted multiple disputed facts. Such disputes, at least in this case, serve to raise more questions about what happened between the parties, and may actually support Plaintiff's allegations. Plaintiff's response, as well as various affidavits, deposition excerpts and other evidence, have effectively set forth specific facts that suggest there are genuine issues for trial.

Based on the foregoing, the undersigned declines to reach any conclusion as to the merits of Plaintiff's lawsuit, but finds that the instant motion for summary judgment is unavailing.

**B.  Plaintiff's Motions**

Based on the decision to deny Defendant's "Motion For Summary Judgment," the undersigned finds that Plaintiff's motions to strike affidavits and motion to allow a sur-reply should be denied as moot.

IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendant's "Motion For Summary Judgment" (Document No. 49) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's "Amended Motion To Strike Affidavit of Kathy Sanders" (Document No. 53), "Amended Motion To Strike Affidavit of Victoria O. Johnson" (Document No. 54), "Amended Motion To Strike Affidavit of Ronald Howard" (Document No. 55), <u>and</u> "Motion For Leave To File A Sur-Reply" (Document No. 64) are **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that parties' "Joint Motion For Continuance" (Document No. 70) is **GRANTED**. The trial of this matter is rescheduled from the February 11, 2013 civil term to the undersigned's next civil term which begins **June 24, 2013**.

**SO ORDERED**.

Signed: January 15, 2013

David C. Keesler
United States Magistrate Judge